IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

LASHUNNA WILSON,                          :
                                          :
        Plaintiff,                        :
                                          :
vs.                                       :    CIVIL ACTION NO. 18-00461-B
                                          :
WARDEN CYNTHIA STEWART, *et*              :
*al.*,                                    :
                                          :
        Defendants.                       :

## ORDER

Plaintiff Lashunna Wilson ("Plaintiff"), as administratrix and personal representative of the estate of William Henry Harris Jr., deceased, filed a complaint under 42 U.S.C. § 1983.[1] This matter is now before the Court on the motions for summary judgment filed by Corizon Health, Inc., Dr. Patrick Arnold, M.D., Ramona Garrick, LPN, Arthur Long, RN, Regina Bolar, Tracy Craft, Sandra Dailey, Rashun Johnson, Kenneth Mason, Nathan McQuirter, Terry Raybon, and Cynthia Stewart (Docs. 115, 118, 121, 127). Also pending before the Court are Defendants' motions to preclude testimony (Docs. 113, 114, 125, 126), Plaintiff's motion to amend order (Doc. 168), and Defendants' motion to strike (Doc. 169).

---

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties consented to have the undersigned conduct any and all proceedings in this case.  (Doc. 100).

All of the motions have been fully briefed and are ripe for resolution.

After careful review of the pleadings, and for the reasons set forth below, it is ordered that Defendants' motions for summary judgment be granted, in part, and denied, in part; that Defendants' motion to preclude be granted, in part, and denied, in part; that Plaintiff's motion to amend order be denied; and that Defendants' motion to strike Plaintiff's motion to amend the Court's order be denied as moot.

## I.   Summary of Factual Allegations and Proceedings.[2]

The tragic events in this case occurred in January 2017, when William Henry Harris, Jr. ("Harris") died while an inmate in the custody of the Alabama Department of Corrections. The autopsy report lists Harris' death as methamphetamine overdose.  Harris' sister, Lashunna Wilson, as the administratrix of his estate, filed the instant action against correctional employees of the Alabama Department of Corrections, namely Regina Bolar ("Bolar"), Tracy Craft ("Craft"), Sandra Dailey ("Dailey"), Rashun Johnson ("Johnson"), Kenneth Mason ("Mason"), Nathan McQuirter ("McQuirter"), Terry Raybon ("Raybon"), and Cynthia Stewart

---

[2] The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n.3 (11th Cir. 2000)(internal quotation marks omitted).

("Stewart"); and against medical Defendants, namely, Corizon Medical Services, LLC ("Corizon"), and three of its employees/medical providers, namely, Dr. Patrick Arnold, M.D. ("Arnold"), Ramona Garrick, LPN ("Garrick"), and Arthur Long, RN ("Long"). Wilson contends that the proximate cause of her brother's death was the negligence, wantonness, willfulness, and deliberate indifference to serious medical needs exhibited by these Defendants.

At all times relevant to this action, Corizon contracted with the Alabama Department of Corrections to provide physical medical care to inmates housed at its correctional centers, including Holman Correctional Facility. (Doc. 117-2 at 3; Doc. 120-1 at 3). In January 2017, Corizon provided nurses to staff the health care units in the correctional centers and contracted with Dr. Arnold to provide physical medical care to inmates at Holman. (Id.). Dr. Arnold was on call, but was not physically present, on January 21, 2017, the date that Harris died, and on the day before his death. (Id. at 4). Garrick, an LPN, and Long, an RN, treated Harris in the Healthcare Unit ("HCU") approximately twenty-two hours before Harris was discovered dead in his cell.

At the time of his death, Harris was assigned to the segregation unit at Holman. (Doc. 117-1 at 2). In the week or two preceding his death, at least two correctional officers, namely Officer Moody and Defendant Officer Mason, observed that Harris

appeared to be acting out of character. (Doc. 138-1 at 25-26, 67). His normally tidy cell was in disarray, and Moody surmised that Wilson might have been intoxicated or under the influence of something. (Doc. 138-1 at 67; Doc. 144-1 at 27, 69).

On January 21, 2017, during the 2:00 a.m. pill call rounds, Officer Mason informed Nurse Garrick that something appeared to be wrong with inmate Harris and that Harris needed to see her. Garrick gave Harris his medicine but did not examine Harris at that time.[3] (Doc. 145, Ex. 4, Mason I&I statement; Doc. 145, Ex. 5, Garrick I&I statement). Approximately two hours later, Officer Mason smelled Clorox on Harris and observed that Harris was speaking "thick tongued," with slurred speech, and appeared to be under the influence. His clothing was wet, and he had difficulty walking. (Doc. 138-1 at 67; Doc. 139).

Mason escorted Harris to the HCU, accompanied by Officers Johnson and Craft. (Doc. 117-3 at 4; Doc. 144-1 at 24, 28). Defendants Nurse Long and Nurse Garrick were on duty in the HCU when Harris arrived. (Doc. 117-3 at 4). The nurses noted that Harris smelled of bleach, that he had a sore throat, and that he

---

[3] In her I&I statement, Nurse Garrick reported that Harris took his medicine during the morning pill call round on January 21, 2017, and that she told Officer Mason that she would be back. Not long after that, at approximately 4:15 a.m., Mason brought Harris to the HCU. (Doc. 139; Doc. 145, Garrick I&I statement; Doc. 117-3 at 4; Doc. 144-1 at 24, 28).

4

had difficulty swallowing.[4]  (Id. at 4, 9-10; Doc. 123-3 at 4-7; Doc. 139; Doc. 144-1 at 5-8, 31).  In addition, Nurse Garrick observed that Harris was acting as if he might be high.  When she asked Harris if he was on any drugs, he said "no."  (Doc. 139). Garrick also questioned Harris about the bleach smell, and he explained that he had been cleaning his cell.  (Doc. 144-1 at 31).

Nurses Long and Garrick performed a physical examination of Harris which revealed that his tonsils were red[5] (Doc. 144-1 at 31) and that his vital signs were normal, with the exception of mildly elevated pulse and blood pressure readings.[6]  (Doc. 117-3 at 4, 9-10).  Long and Garrick also noted that Harris' respiratory systems were normal; his lung sounds were clear; and his eyes, nose, and skin were normal.  (Id.; Doc. 144-1 at 10, 31).

---

[4] Nurse Long testified that it may have been Officer Mason who reported that inmate Harris was having trouble swallowing.  (Doc. 144-1 at 11).  Nurse Garrick observed that Harris appeared to be "kind of choking."  (Doc. 139).

[5] Nurse Garrick stated in her I&I statement that Harris reported that his throat was sore.  Upon examination, she saw that his tonsil on the left side was swollen.  (Doc. 139).  In her deposition, she stated that Harris' tonsils were not "excessively swollen" and "were not obstructing his airway."  (Doc. 138-1 at 18).

[6] Harris' temperature was 98.2; his pulse was 113; his respirations were 18; his blood pressure was 120/100; his oxygen saturation rate was 95%; and his respiratory systems were normal.  Nurse Long testified that he attributed Harris' slightly elevated pulse to him having just walked up a hill to the HCU and his slightly elevated blood pressure to him having been non-compliant with his prescribed blood pressure medication.  (Doc. 117-3 at 4-5; Doc. 144-1 at 31).

Harris was able to communicate, was coherent and logical, was able to sit on the examination table while the physical assessment was taken, and did not complain of any symptoms besides difficulty swallowing. (Doc. 123-3 at 4-7). Nurse Garrick examined Harris' throat and observed no obstruction, although Harris' tonsils were a little red and/or swollen. (Doc. 138-1 at 18).

At the conclusion of their examination and questioning, Nurses Garrick and Long assessed Harris as having an allergic reaction to bleach. (Doc. 123-4 at 10-11). They suggested that Harris remain in the HCU until his cell could be cleaned of the bleach, but he refused and insisted on returning to his cell. (Doc. 117-3 at 4, 9-10; Doc. 144-1 at 5). Mason informed Long and Garrick that Harris' cell would be ventilated, and subsequent thereto, Macon ventilated the cell with the use of fans. (Id.; Doc. 144-1 at 5).

Prison records reflect that Harris received all of his meals on January 21st, as well as his morning medication. (Doc. 138-1 at 23). At approximately 5:00 p.m., during pill call, Harris was observed lying on his bed. (Doc. 138-1 at 23; Doc. 139). When Harris was called by Officer Moody, he rolled over, but refused to get up for his afternoon medication.[7] (Doc. 139). Later that day,

---

[7] The Court notes that the I&I report reflects that Moody stated that Harris refused his medication at the 5:00 a.m. pill call on January 21, 2017. (Doc. 138-1 at 67). However, in Moody's actual audio statement to the I&I investigator, Officer Moody clearly

at approximately 6:30 p.m., inmates in the segregation unit began yelling "man down, man down" in order to alert the guards that Harris was in medical distress. (Doc. 117-5 at 9-11). No guards came. (Id.). Although prison records reflect that officer Johnson conducted a count in the segregation unit between 6:15 and 7:08 p.m., and that between 9:01 and 9:20 pm, officer Mason escorted Nurse Thomas to segregation for pill call, officer McQuirter testified that, on January 21st, he was assigned to cubicle 5 in the segregation unit from 6:00 to 10:00 pm, and that, during his shift, no one came to the segregation unit. (Doc. 128-15 at 4).

On January 22, 2017, Officers Johnson and Craft escorted Nurse Garrick for the morning pill call round and discovered Harris dead in his cell at approximately 2:40 a.m.[8] (Doc. 117-3 at 7; Doc. 117-4 at 7; Doc. 128-3 at 4-5; Doc. 145, Ex. 5). As noted, *supra*, an autopsy revealed the cause of death as toxic effects of methamphetamine. (Doc. 117-2 at 4).

In the amended complaint, Wilson asserts the following claims: (1) against ADOC Defendants Johnson, Mason, Craft and McQuirter - failure to provide adequate medical care resulting in

---

stated that Harris refused his medication at the 5:00 p.m. (afternoon) pill call. (Doc. 139).

[8] The Court notes that the events occurring between 6:30 p.m. on January 21, 2017, and 2:40 a.m. on January 22, 2017, are largely in dispute.

wrongful death in violation of 42 U.S.C. § 1983 (First Cause of Action); (2) against ADOC Defendants Stewart, Raybon, Dailey, and Bolar - failure to hire, train, and supervise in violation of 42 U.S.C. § 1983 (Second Cause of Action); (3) against ADOC Defendants Johnson, Mason, Craft, and McQuirter - wrongful death under state law (Third Cause of Action); (4) against ADOC Defendants Stewart, Raybon, Dailey, and Bolar - wrongful death under state law (Fourth Cause of Action);[9] (5) against medical Defendants Nurses Garrick and Long - failure to provide adequate medical care resulting in wrongful death in violation of 42 U.S.C. § 1983 (Sixth Cause of Action); (6) against medical Defendant Dr. Arnold - failure to hire, train, and supervise in violation of 42 U.S.C. § 1983 (Seventh Cause of Action); (7) against medical Defendants Nurses Garrick and Long - wrongful death under state law (Eighth Cause of Action); (8) against medical Defendant Dr. Arnold - wrongful death under state law (Ninth Cause of Action); (9) against medical Defendant Corizon – Agency (Tenth Cause of Action); (10) against medical Defendants Nurses Garrick and Long - medical malpractice under state law (Eleventh Cause of Action); and (11) against medical Defendants Dr. Arnold and Corizon - medical malpractice under state law (Twelfth Cause of Action).  (Doc. 17).

Defendants have filed answers denying Plaintiff's allegations

---

[9] There is no Fifth cause of action.

and motions for summary judgment on all claims, with supporting evidentiary submissions.  Plaintiff has likewise filed responses to Defendants' submissions, with supporting evidentiary submissions.  All motions are now ripe for consideration.

   II. **<u>Summary Judgment Standard</u>**.

   In analyzing the propriety of a motion for summary judgment, the Court begins with these basic principles.  The Federal Rules of Civil Procedure grant this Court authority under Rule 56 to render "judgment as a matter of law" to a party who moves for summary judgment.  Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The party moving for summary judgment bears the "initial responsibility of informing the district court of the basis for [their] motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which [they] believe[] demonstrate the absence of a genuine issue of material fact." <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991) (bracketed text added)(quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)).

   If the moving party does not have the burden of proof at trial, they may show that "there is an absence of evidence to support the nonmoving party's case." <u>United States v. Four Parcels</u>

of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991) (citations omitted).  Alternatively, the moving party may support its "motion for summary judgment with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." Id.  If the moving party meets this burden, the non-movant, as the party bearing the burden of proof at trial, must set forth specific facts, supported by citation to the evidence, to support the elements of the case at trial, and therefore, establish that there is a genuine issue for trial.  Fed. R. Civ. P. 56(c).  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252, 257 (1986)("This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery.").

Overall, the Court must "resolve all issues of material fact in favor of the [non-movant], and then determine the legal question of whether the [movant] is entitled to judgment as a matter of law under that version of the facts."  McDowell v. Brown, 392 F.3d 1283, 1288 (11th Cir. 2004)(citing Durruthy v. Pastor, 351 F.3d 1080, 1084 (11th Cir. 2003)).  "[A]ll reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant."  Citizens Trust Bank v. Lett, 2015 U.S. Dist. LEXIS 90849, 2015 WL 4254561, *1 (N.D. Ala. 2015).  The Court is obligated to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving

party.  See <u>Skop v. City of Atlanta</u>, 485 F.3d 1130, 1136 (11th Cir. 2007).

However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment.  <u>Lofton v. Secretary of Dep't of Children and Family Services</u>, 358 F.3d 804, 809 (11th Cir. 2004).  "An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. It is genuine if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party."  <u>Reeves v. C.H. Robinson Worldwide, Inc.</u>, 594 F.3d 798, 807 (11th Cir. 2010) (citation omitted).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Allen v. Bd. of Public Education for Bibb County</u>, 495 F. 3d 1306, 1313 (11th Cir. 2007).

### III. <u>Abandoned Claims</u>.

As discussed, in the amended complaint, Wilson alleges that correctional Defendants Craft and McQuirter failed to provide adequate medical care, that correctional Defendants Stewart, Raybon, Dailey, and Bolar failed to hire, train and supervise, and that Defendants Craft, McQuirter, Stewart, Raybon, Dailey, and Bolar are liable for Harris' wrongful death. (Doc. 17).

On September 8, 2020, these Defendants filed a motion for

summary judgment, arguing, *inter alia*, that the record is void of
evidence that they were deliberately indifferent to inmate Harris'
serious medical needs; that they are entitled to qualified immunity
on Plaintiff's § 1983 claims; that they are entitled to state-
agent immunity on all state law claims; and that Wilson has failed
to present evidence of the essential elements of her claims,
including those for supervisory liability.  (Docs. 127, 131, 132,
134).  Although Wilson opposed the motions for summary judgment
filed by the other Defendants in this case (namely, the medical
Defendants Corizon, Arnold, Garrick, and Long, and correctional
Defendants Mason and Johnson), she filed no response whatsoever to
the motions for summary judgment filed by correctional Defendants
Craft, McQuirter, Stewart, Raybon, Dailey, and Bolar.

Indeed, on October 14, 2020, Defendants Craft, McQuirter,
Stewart, Raybon, Dailey, and Bolar filed a "Notice," asserting
that Wilson's failure to respond to or oppose their arguments in
support of summary judgment constituted an abandonment of her
claims against them, and, thus, they were entitled to judgment as
a matter of law.  (Doc. 163).  To date, Wilson has not responded
to Defendants' assertion, nor has she in any way objected to or
opposed these Defendants' arguments in support of their motion for
summary judgment.

The law is clear that "[a] party may not rely simply on his
pleadings to avoid summary judgment."  <u>Sherman v. Speer</u>, 2019 U.S.

Dist. LEXIS 76990, *47, 2019 WL 3006626, *16 (M.D. Ala. Mar. 27, 2019), *report and recommendation adopted*, 2019 WL 2009282 (M.D. Ala. May 7, 2019)(citing Edmondson v. Board of Trustees of Univ. of Alabama, 258 Fed. Appx. 250, 253 (11th Cir. 2007)("Edmondson did not respond to UAB's motion for summary judgment on the Equal Protection Act claim. Therefore, she has abandoned it."). "Rather, the parties bear the burden of formulating arguments, and claims alleged in the complaint but not relied upon in summary judgment are deemed abandoned." Id. "Although a district court must ensure that summary judgment is appropriate against a party that files no response at all, where the non-moving party responds to summary judgment but fails to address a particular argument asserted in the summary judgment motion, the court may properly consider the non-movant's default as intentional and treat the claim as abandoned." Id. (citing Powell v. American Remediation & Envtl., Inc., 61 F. Supp. 3d 1244, 1253 n.9 (S.D. Ala. 2014), *aff'd*, 618 Fed. Appx. 974 (11th Cir. 2015)("Where a party wholly fails to respond to a summary judgment motion, the district court must make sure that it nonetheless is appropriate to enter summary judgment against the party that did not respond; in contrast, where the non-moving party fails to address a particular claim asserted in the summary judgment motion but has responded to other claims made by the movant, the district court may properly consider the non-movant's default as intentional and therefore consider the claim

abandoned.")).  Accord Carter v. L'Oreal USA, Inc., 2019 U.S. Dist. LEXIS 168384, *23, 2019 WL 4786949, *8 (S.D. Ala. Sept. 30, 2019)("Plaintiffs raise no objection to or argument against Defendants' assertion [as to Count II], either in their response to the original motion for summary judgment or in their response to Defendants' amended summary judgment motion, nor do they point to any record evidence to dispute it. As such, the claim has been abandoned."); Givens v. Saxon Mortg. Servs., Inc., 2014 U.S. Dist. LEXIS 74395, *50, 2014 WL 2452891, *16 (S.D. Ala. June 2, 2014)("Givens has failed to respond to the Defendants' [summary judgment] arguments regarding this claim. Thus, she has abandoned her claim in Count Five.").

Because Wilson in the instant case filed a response in opposition to the arguments for summary judgment made by six other Defendants but chose not to address the claims or arguments for summary judgment made by Defendants Craft, McQuirter, Stewart, Raybon, Dailey and Bolar, the Court finds that she has abandoned her claims against those Defendants.

Accordingly, the Court **grants** the motion for summary judgment filed by Defendants Craft, McQuirter, Stewart, Raybon, Dailey, and Bolar.  (Docs. 127).  Plaintiff's claims against these Defendants are **dismissed, with prejudice.**

IV.  **Medical Defendants**.

In the amended complaint, Wilson asserts claims against

14

Nurses Garrick and Long for wrongful death under 42 U.S.C. § 1983 based on their alleged failure to provide adequate medical care and for wrongful death and medical malpractice under state law. (Doc. 17)(Sixth, Eighth, and Eleventh Causes of Action).   In addition, Wilson asserts a claim against Dr. Arnold for failure to hire, train, and supervise under § 1983 and for wrongful death and medical malpractice under state law.  (Doc. 17)(Seventh, Ninth, and Twelfth Causes of Action).  Wilson also asserts state law claims against Corizon for agency and medical malpractice.  (Doc. 17)(Tenth and Twelfth Causes of Action).  Defendants contend that they are entitled to summary judgment due to lack of evidence to support the essential elements of the claims.  The Court addresses each of Wilson's claims against the medical Defendants in turn.

### A. Claims Against Nurses Garrick and Long.

#### i.   Section 1983 Failure to Provide Adequate Medical Care Resulting in Wrongful Death.

As noted, *supra*, Wilson has asserted a wrongful death claim through § 1983 for failure to provide adequate medical care, resulting in in the death of her brother, William Harris.[10]   "[I]n the context of suits commenced by the personal representative of a decedent's estate, and alleging that constitutional violations under color of Alabama law caused the death of the plaintiff's

---

[10] As discussed, Wilson also asserts a state law claim against Garrick and Long for wrongful death.

decedent, . . . a § 1983 claim asserted through § 1988(a) 'incorporates' Alabama's wrongful death statute for the purpose of claiming damages from the state actors responsible for the death." Waites v. Limestone Corr. Facility, 2017 U.S. Dist. LEXIS 98771, *36, 2017 WL 2797124, *16 (N.D. Ala. June 27, 2017)(citations omitted). Thus, Wilson proceeds against Defendants Garrick and Long for wrongful death based upon Ala. Code § 6-5-410, asserted through 42 U.S.C. § 1983 and § 1988(a). (Doc. 17 at ¶ 102).

"In order for a plaintiff to establish a claim under 42 U.S.C. § 1983, he [or she] must prove (1) a violation of a constitutional right, and (2) that the alleged violation was committed by a person acting under the color of state law." Martinez v. Burns, 459 Fed. Appx. 849, 850-851 (11th Cir. 2012). There is no dispute that the named medical Defendants, as contracted medical providers of the Alabama Department of Corrections, are state actors for purposes of this action. See Cooley v. Streeter, 2020 U.S. Dist. LEXIS 88918, *18, 2020 WL 4211287, *7 (S.D. Ala. May 19, 2020), *report and recommendation adopted*, 2020 WL 4209226 (S.D. Ala. July 22, 2020). Thus, to establish her asserted claims, Wilson must establish that each named Defendant personally acted to deprive Harris of a constitutional right.

The Eighth Amendment prohibits indifference to a convicted prisoner's serious medical needs so deliberate that it "constitutes the unnecessary and wanton infliction of pain."

16

Estelle v. Gamble, 429 U.S. 97, 104 (1976).  "To prevail on a claim of deliberate indifference, a plaintiff must show: (1) a serious medical need; (2) defendant's deliberate indifference to that need; and (3) causation between the defendant's indifference and the plaintiff's injury."  McDaniels v. Lee, 405 Fed. Appx. 456, 458 (11th Cir. 2010) (citing Mann v. TaserInt'l, Inc., 588 F.3d 1291, 1306-07 (11th Cir. 2009)).  To satisfy the first objective element, Wilson must prove that Harris' condition was, in fact, a serious medical need.  "A 'serious medical need' is one that is diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would recognize the need for medical treatment." Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1317 (11th Cir. 2010) (internal quotations omitted).  "To satisfy the subjective element of [a] deliberate indifference [claim, a] . . . . Plaintiff must prove three subparts: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005)(internal quotations omitted)(noting that subjective knowledge requires that defendant "'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [] must also draw the inference'") (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)); see also Townsend v. Jefferson Cnty., 601 F.3d 1152, 1158 (11th Cir. 2010).

"A prisoner bringing a deliberate-indifference claim has a steep hill to climb." Keohane v. Fla. Dep't of Corrs. Sec'y, 952 F.3d 1257, 1266 (11th Cir. 2020). The Constitution does not require that the medical care provided to prisoners be "perfect, the best obtainable, or even very good." Id. (quoting Harris v. Thigpen, 941 F.2d 1495, 1510 (11th Cir. 1991)). "Rather, '[m]edical treatment violates the [E]ighth [A]mendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" Id. at 1505 (citation omitted). The Eleventh Circuit has emphasized that "a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment [fails to] support a claim of cruel and unusual punishment." Id. (citing Lamb v. Norwood, 899 F.3d 1159, 1162 (10th Cir. 2018)("We have consistently held that prison officials do not act with deliberate indifference when they provide medical treatment even if it is subpar or different from what the inmate wants.").

First, with respect to the issue of whether Harris had a serious medical need, the undisputed evidence shows that on January 21, 2017, Officer Mason noticed that Harris and his cell smelled of bleach and that Harris was acting "out of the ordinary." Thus,

around 4:15 a.m., Mason transported Harris to the HCU[11] where he was seen by Nurses Garrick and Long. (Doc. 117-3 at 4; Doc. 123 at 24; Doc. 144-1 at 24, 28). Nurse Garrick questioned Harris about whether he was on drugs, and Harris replied "no."[12] (Doc. 139). When questioned about why he smelled of bleach, Harris indicated that he had been cleaning his cell with bleach. Harris complained of a sore throat and appeared to have difficulty swallowing. (Doc. 117-3 at 4, 9-10; Doc. 123-3 at 4-7; Doc. 139; Doc. 144-1 at 5-8, 31). Nurse Garrick described Harris' symptoms as "kind of choking." (Doc. 139). Following their examination of Harris, Nurses Garrick and Long assessed him as having an allergic reaction to bleach. (Doc. 123-4 at 10). Based on the foregoing undisputed evidence, the Court finds that Harris had a serious medical need.

Next, with respect to the issue of whether Defendants Garrick or Long were deliberately indifferent to Harris' serious medical need, the undisputed evidence shows, as discussed, that Harris was questioned about possible intoxication and about the bleach on his

---

[11] At some point earlier, Mason and at least one other correctional officer had observed Harris acting out of character, like he might have been intoxicated, and his cell, which was normally neat, was in disarray. (Doc. 138-1 at 67; Doc. 144-1 at 27, 69).

[12] In her I&I statement, Nurse Garrick stated that she asked Officer Mason if Harris normally acted like that and talked like that, referring to his hoarseness, and Officer Mason said "no." (Doc. 139).

person.[13]   (Doc. 144-1 at 31).   The evidence further shows that Harris sat on the examination table while the nurses questioned him and undertook a physical examination.   Harris was able to communicate while in the HCU and was coherent and logical.   Harris did not complain of any symptoms other than difficulty with his ability to swallow and having a sore throat.[14]   (Doc. 123-3 at 4-7; Doc. 139).   Harris' physical examination revealed that his tonsils were red (Doc. 144-1 at 31) and that his vital signs were normal, with the exception of mildly elevated pulse and blood pressure readings.   (Doc. 117-3 at 4, 9-10).   Nurses Garrick and Long attributed Harris' slightly elevated pulse to him having just walked up a hill to the HCU and his slightly elevated blood pressure to him having been non-compliant with his prescribed blood pressure medication.   (Doc. 117-3 at 4-5; Doc. 144-1 at 31; Doc. 123-4 at 7).   Harris' respiratory systems were normal.   His lung sounds were clear.   His eyes, nose, and skin were normal.   (Doc. 117-3 at 4, 9-10), Doc. 144-1 at 10, 31).

Nurses Garrick and Long concluded that Harris was having an allergic reaction to bleach.   (Doc. 123-4 at 4, 10).   They recommended that Harris stay in the HCU until his cell could be

---

[13] Officer Mason stated in his I&I statement that Harris' cell and his clothes were wet with bleach.   (Doc. 139).

[14] Nurse Garrick stated in her I&I statement that Harris was hoarse. (Doc. 139).

cleaned of bleach, but Harris refused and insisted on returning to his cell.[15]   (Doc. 117-3 at 4, 9-10; Doc. 144-1 at 5).   Officer Mason informed Nurses Garrick and Long that Harris' cell would be ventilated, and Mason did in fact use fans to ventilate Harris' cell.   (Id.; Doc. 144-1 at 5).   Harris returned to his cell and neither Garrick nor Long saw Harris again until Garrick and correctional Officers Johnson and Craft found Harris unresponsive during a pill check nearly twenty-four hours later.   (Doc. 123-4 at 7).

Based on the foregoing evidence, the Court finds that Wilson has failed to establish that Nurse Garrick or Nurse Long had *subjective* knowledge of a risk of serious harm to Harris and disregarded that risk.   To the contrary, Garrick and Long questioned Harris, examined him, and assessed him as having an allergic reaction to bleach.   This was reasonable given the facts presented at that time, not the least of which were the facts provided by Harris himself that he had been exposed to bleach and had not ingested any drugs.   Although Garrick observed that Harris looked as if he might be high, she stated that it was "hard to

---

[15] Nurse Garrick stated in her I&I statement that she cautioned Harris that he needed to get out of his cell and away from the bleach, because if he was having an allergic reaction, he could die.   (Doc. 139).   Harris insisted on returning to his cell. (Id.).

determine."[16]   (Doc. 139).   This evidence does not suggest, as Wilson argues, that Garrick and Long "fully recognized Harris was high on drugs and was suffering from adverse effects of drug intoxication" (Doc. 137 at 16) and deliberately disregarded his serious medical condition, by conduct that was "more than gross negligence."  Sifford v. Ford, 701 Fed. Appx. 794, 795 (11th Cir. 2017)("Deliberate indifference must be more than an inadvertent failure to provide adequate medical care, negligence in diagnosis or treatment, or medical malpractice.").   Also, contrary to Wilson's argument, Garrick and Long's failure to diagnose drug intoxication, as opposed to a bleach allergy, does not establish deliberate indifference.   See id., 701 Fed. Appx. at 796 (neither a difference in medical opinion nor a mistaken medical judgment is sufficient to establish deliberate indifference under the Eighth Amendment).

The Court also finds unpersuasive Wilson's argument that Garrick and Long were deliberately indifferent to Harris' serious medical needs because they failed to contact Dr. Arnold, the on-call physician, to seek his advice regarding Harris' treatment. Garrick and Long testified that they did not contact Dr. Arnold because, in their judgment, it was not an emergency or life-

---

[16] Long testified that he had no reason to believe that Harris was "high on anything," and he was unaware that Garrick thought that Harris "looked like" he might be high on something.  (Doc. 138-1 at 7).

threatening situation and was not necessary.  (Doc. 138-1 at 7, 19).  Indeed, Harris' physical examination findings at that time revealed no emergency.  In any event, Garrick's and Long's medical judgment, even if mistaken, is not sufficient to support a claim for deliberate indifference.  See Sifford, 701 Fed. Appx. at 795.

Based on the undisputed evidence in this case, the Court finds that Wilson has failed to set forth specific facts, supported by citation to the evidence, to support her claim that Defendants Garrick and Long were deliberately indifferent to Harris' serious medical needs.  Therefore, Wilson's § 1983 claim against Defendants Garrick and Long for failure to provide adequate medical care resulting in Harris' wrongful death (Sixth Cause of Action) fails, as a matter of law, and their motion for summary judgment on this claim (Doc. 121) is **granted.**

> ii.  **Medical Malpractice and Wrongful Death Under State Law.**

Next, Wilson asserts state law medical malpractice and wrongful death claims against Defendants Garrick and Long.  Wilson alleges that Garrick and Long "had a duty to follow the standard of reasonable care, skill, and diligence in their care and treatment of Harris that is used by similarly situated health care providers in the same general line of practice."  Wilson further alleges that these Defendants "negligently breached" their duty by: "(a) failing to properly identify Harris was in need for urgent

23

medical treatment; (b) failing to properly assess, document, and report Harris['] signs, symptoms, and complaints to a licensed physician; (c) and failing to identify [and] provide Harris with necessary medical care for his serious medical need". Wilson also alleges that "Defendants Garrick and Long's acts or omissions were willful, malicious, in bad faith, beyond his or her authority or under a mistaken interpretation of the law;" and that "[a]s a direct and proximate result of the acts or omissions of defendants Garrick and Long, [Wilson] suffered unnecessary and wanton infliction of pain, suffering, anguish, and distress that culminated in his death." (Doc. 17 ¶¶ 113-18, 136-39).

In their summary judgment motion, Defendants Garrick and Long argue that Wilson's medical malpractice and wrongful death claims fail as a matter of law. Defendants assert that there is no evidence, particularly admissible expert evidence, establishing a causal connection between any action, inaction, or omission on their part which constituted a breach of the standard of care and proximately caused Harris' death. (Doc. 123 at 11-13).

Any action for medical malpractice or for wrongful death against a health care provider for breach of the standard of care in Alabama is construed and governed by the Alabama Medical Liability Act ("AMLA"), Ala. Code § 6-5-541, *et seq.* (1975). The AMLA applies to "any action for injury or damages or wrongful death, whether in contract or in tort, against a health care

provider for breach of the standard of care." Ala. Code § 6-5-548(a). Under the AMLA, "in any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care, the plaintiff shall have the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case." Id. Thus, a plaintiff in a medical malpractice action under the AMLA, like the present one, "must present expert testimony from a similarity-situated healthcare provider to illustrate (1) the appropriate standard of care, (2) a deviation in the instant case from that standard of care, and (3) that the deviation proximately caused the injury in the case." Thornton v. Mitchell, 2020 U.S. Dist. LEXIS 78755, *22, 2020 WL 2128583, *8 (M.D. Ala. May 5, 2020), *reconsideration denied*, 2020 WL 4677522 (M.D. Ala. Aug. 12, 2020)(citing Breland ex rel. Breland v. Rich, 69 So. 3d 803, 814 (Ala. 2011)).

The standard of care allegedly breached in this case is one involving hands-on nursing care in a prison setting by a licensed practical nurse ("LPN") and a registered nurse ("RN"). Therefore, § 6-5-548(b) applies. Under § 6-5-548(b), a non-specialist[17]

---

[17] Section 6-5-548(c), which applies to medical "specialists," does not apply here.

"similarly situated healthcare provider" is one who: (1) is licensed by the appropriate regulatory board or agency of this or some other state; (2) is trained and experienced in the same discipline or school of practice; and (3) has practiced in the same discipline or school of practice during the year preceding the date that the alleged breach of the standard of care occurred. Id. (citing Ala. Code (1975) § 6-5-548(b)).

In addition, in order to prove causation in a medical-malpractice action, the plaintiff must demonstrate "that the alleged negligence probably caused, rather than only possibly caused, the plaintiff's injury." Bradley v. Miller, 878 So. 2d 262, 266 (Ala. 2003)(citations omitted). "A plaintiff must present expert evidence to satisfy each of the above elements, or [the] case must fail as a matter of law." Thornton, 2020 U.S. Dist. LEXIS 78755, *22, 2020 WL 2128583 at *8 (citing Sherrer v. Embry, 963 So. 2d 79, 82-83 (Ala. 2007); Ex parte Waddail, 827 So. 2d 789, 795-96 (Ala. 2001); Medlin v. Crosby, 583 So. 2d 1290, 1292-96 (Ala. 1991)).

As discussed, the undisputed evidence in this case shows that Harris was found dead in his cell at approximately 2:40 a.m. on January 22, 2017. The autopsy revealed that he died of an overdose of methamphetamine. (Doc. 117-2 at 4; Doc. 117-3 at 7; Doc. 117-4 at 7; Doc. 128-3 at 4-5; Doc. 145, Ex. 5). Garrick, an LPN, and Long, an RN, last interacted with Harris approximately twenty-

two hours earlier, when Officer Mason brought Harris to the HCU around 4:15 a.m. on January 21, 2017, for evaluation.  (Doc. 117-3 at 4, 7; Doc. 117-4 at 7; Doc. 128-3 at 4-5; Doc. 144-1 at 24, 28; Doc. 145, Ex. 5).  The undisputed evidence related to Garrick's and Long's examination and treatment of Harris on this occasion has been discussed at length and will not be repeated here.

In support of their motion for summary judgment, Garrick and Long have offered their own testimony that they are familiar with the standard of care applicable to providing nursing care to patients such as Harris, and that, at all times, the nursing care that they provided was reasonable, appropriate, and consistent with the standard of care applicable to nurses in Alabama. (Doc. 123-3 at 7-8; Doc. 123-4 at 7-8).  In addition, Garrick and Long have offered the expert testimony of Peggy Minyard, RN, that, based on her review of the evidence in this case and her experience as an RN in correctional nursing in the State of Alabama, including during the year prior to Harris' death, "Long and Garrick at all times provided nursing care to Harris within the standard of care of [RN and LPN] nurses practicing nursing in the state of Alabama." (Doc. 123-8 at 4; Doc. 123-9 at 2-5).

Defendants Garrick and Long further argue that they are entitled to summary judgment on Wilson's AMLA claims because she has presented no admissible expert testimony that their actions or inactions failed to meet the standard of care of similarly situated

27

LPN's or RNs, nor has she offered any admissible expert evidence that their actions or inactions "probably caused" Harris' death. In connection therewith, Defendants Garrick and Long have filed a motion seeking to preclude Lori Roscoe, Wilson's expert on the nursing standard of care in the correctional setting, from offering testimony with respect to them. (Docs. 114, 126). They also seek to preclude Dr. Robert Gilbert from offering testimony on causation with respect to them. (Doc. 113, 125).  Upon consideration, the undersigned finds that Garrick's and Long's motions to preclude the aforementioned testimony are due to be denied, as set forth herein, as is their motion for summary judgment (Doc. 121) on Wilson's AMLA claims.

### a. Defendants' Motions to Strike the Expert Testimony of Lori Roscoe and Dr. Robert Gilbert, D.O.

In opposition to Garrick and Long's motions for summary judgment, Wilson offers the testimony of two experts: Lori Roscoe, DNP, APRN, ANP-C, CCHP-RN; and Dr. Robert Gilbert, D.O.  After due consideration, the Court finds that Ms. Roscoe meets the exception to § 6-5-548 of the AMLA regarding testimony by "similarly-situated healthcare providers" and, therefore, is qualified to offer testimony regarding the correctional nursing standard of care allegedly breached by Nurses Long and Garrick.  The Court further finds that Dr. Gilbert is not a "similarly-situated healthcare provider," pursuant to § 6-5-548 of the AMLA, with respect to

Nurses Garrick and Long, nor does he meet the exception to that provision with respect to the nurse Defendants. Therefore, Dr. Gilbert is not qualified to testify to the correctional nursing standard of care allegedly breached by Nurses Long and Garrick. However, the Court finds that Dr. Gilbert's testimony on causation with respect to Nurses Garrick and Long is admissible.

Turning first to Wilson's proffered expert testimony of Lori Roscoe, a nurse practitioner, Ms. Roscoe opines that "[t]he failure of LPN Garrick to document her evaluation of Mr. Harris (or ensure that this information was properly documented) in his health record seriously breached the nursing standard of care;" "[t]he failure of LPN Garrick to notify RN Long and the provider [Dr. Arnold] of her abnormal findings significantly deviated from the nursing standard of care;" and "[t]he failure of LPN Garrick and RN Long to ensure that their patient who was complaining of difficulty swallowing, and presented with abnormal vital signs, swollen tonsils, hoarseness, and acting like he was "high" was monitored properly by housing him in the medical observation unit significantly deviated from the nursing standard of care" (Doc. 46-1 at 7-8); "[t]he failure of RN Long to contact the provider [Dr. Arnold] to discuss Mr. Harris' abnormal presentation significantly deviated from the nursing standard of care;" [t]he failure of RN Long to conduct a thorough and appropriate assessment of Mr. Harris to include an evaluation of his throat and tonsils

for a complaint of difficulty swallowing and presenting with a hoarse voice significantly deviated from the nursing standard of care;" "[t]he failure of RN Long to ensure that all information about Mr. Harris' medical condition and presentation, including that his tonsils were swollen, was documented in his health record deviated significantly from the nursing standard of care;" "[t]he failure of RN Long to ensure the safety of his patient by not sending him back to the cell that smelled of bleach, in which he developed tachycardia and difficulty swallowing significantly deviated from the nursing standard of care;" and "[t]he failure of RN Long to schedule Mr. Harris to be seen for follow-up to ensure that his condition was improving significantly deviated from the nursing standard of care."   (Doc. 146-1 at 7-9).   Ms. Roscoe offered the foregoing opinions in support of her finding that Garrick and Long deviated from the applicable nursing standard of care.[18]

Defendants Garrick and Long seek to exclude Ms. Roscoe's testimony on the grounds that she is not similarly situated to Garrick (an LPN) or Long (an RN) so as to be qualified to offer an opinion on whether either deviated from the applicable standard of nursing care for an LPN or RN in the correctional setting.

---

[18] Ms. Roscoe did not offer any testimony on medical causation. (Doc. 154-1 at 12-14).

Specifically, Defendants argue that Roscoe fails to meet the requirement of § 6-5-548(b) that she "has practiced in the *same* discipline or school of practice *during the year preceding* the date that the alleged breach of the standard of care occurred," as required by the statute. (Emphasis added). Garrick and Long point out that Ms. Roscoe is an advanced level practical nurse/nurse practitioner and was so in the year preceding the events at issue (Doc. 154-1 at 3-4); that she earned her Bachelor of Science in Nursing in 1989 (id.); that in 2014, she graduated with a master's degree in nursing with an advanced nurse practitioner concentration (id. at 4); that she thereafter began working as a nurse practitioner at a correctional facility in Georgia (id. at 9); that she has never practiced as an LPN, and she has not worked as a registered nurse (RN) since before 2007 -- over ten years before the events at issue in this case (id. at 3-9); and that her only clinical experience since 2007 (when she worked as an RN) has been as a nurse practitioner, including the year preceding the events in question. (Id. at 8).

This Court held in Estate of Bradley ex rel. Bradley v. Mariner Health, Inc., 315 F. Supp. 2d 1190, 1195 (S.D. Ala. 2004), *aff'd sub nom.,* Bradley v. Living Centers-E., Inc., 138 Fed. Appx. 298 (11th Cir. 2005), that a nurse practitioner expert is not similarly situated to a registered nurse or licensed practical nurse and, as such, is unable to testify to the standard of care

31

allegedly breached by such nursing defendants.  In Bradley, this Court further held that the nurse practitioner was not qualified to testify under the limited exception to § 6-5-548(b) of the AMLA as announced by the Alabama Supreme Court in Dowdy v. Lewis, 612 So. 2d 1149 (Ala. 1992), because she was not highly trained and experienced in the area of hands-on nursing care to patients at nursing home facilities.  As explained in Bradley, unless an exception applies, Ms. Roscoe, a nurse practitioner, is not qualified to testify to the nursing standard of care in this case appliable to Nurses Garrick (an LPN) and Long (an RN).

Wilson argues that the Court should find that Roscoe falls within the limited exception to § 6-5-548(b) announced in Dowdy, 612 So. 2d 1149 (Ala. 1992).  In Dowdy,  the Alabama Supreme Court held that, although the defendant's proffered nursing experts had not practiced in the same discipline as the defendant during the year preceding the alleged breach of the standard of care, as required by § 6-5-548(b), because they were nursing teachers who were working on the "cutting edge" of "modern trends in nursing," they were considered "highly qualified" in the nursing discipline at issue and allowed to testify.  Similarly, in HealthTrust, Inc. v. Cantrell, 689 So. 2d 822, 827 (Ala. 1997), the Alabama Supreme Court again held that the plaintiff's proffered expert met the limited exception to § 6-5-548(b) and was "highly qualified" to testify to the standard of care for an operating room technician

where she had trained and worked as a registered nurse, as a certified operating room nurse, and as a surgical assistant; she was the director of medical services at a hospital; she gave continuing education lectures on operating room safety; and she had written for national publications in her field.

In the present case, in addition to Ms. Roscoe's qualifications listed above, the evidence shows that she worked as an instructor for an LPN program at a technical college from 2006-2007; she worked, during 2009 to 2013, as the Director of Special Projects pertaining to nursing services, the Director of Clinical Nursing Services, and Director of Clinical Support, for a company that contracted with the Georgia Department of Corrections. In her her administrative roles in the correctional setting, she has been responsible for policy and procedure development, staff supervision, and staff education. (Doc. 146-1). Nurse Practitioner Roscoe is also a member of the American Nurses Association's national expert work group that reviewed and revised the *Correctional Nurse: Scope and Standards of Practice* published in 2013 and updated in 2020; she is the Lead Nurse Planner for the Multi-Disciplinary Education Committee of the National Commission on Correctional Health Care; and she is an Editorial Board member and peer reviewer for the Journal of Correctional Health Care. (Id.). Additionally, she developed and maintains an online educational website which offers nurses continuing education

credits in topics specifically related to correctional nursing; and she owns and operates a consulting business that provides correctional consulting services on matters including facility operations, national correctional standards, facility policies and procedures, nursing protocols, and quality improvement audits. (Doc. 146-1).

Based on the foregoing, the Court finds that Nurse Practitioner Roscoe's qualifications render her "highly qualified" in hands-on correctional LPN and RN nursing; thus, she is exempt from the mandatory requirements of § 6-5-548. Accordingly, Defendant's motions to exclude the proffered expert testimony of Nurse Practitioner Roscoe that Garrick (an LPN) and Long (an RN) failed to meet the standard of care of similarly situated LPN's and RNs in the correctional setting (Docs. 114, 126) is **denied.**

Next, Wilson has proffered the expert testimony of Dr. Robert Gilbert, DO, who opined that Nurses Garrick and Long had an obligation to contact Dr. Patrick Arnold, the Corizon Medical Director at Holman, for guidance with respect to Harris' treatment; that they failed to properly document Harris' symptoms; that they failed to recheck his vital signs; and that they should have prevented Harris from returning to his cell. (Doc. 147 at 4; Doc. 113-1 at 4-5; Doc. 147-1 at 14-15). Dr. Gilbert's proffered testimony regarding Garrick's and Long's breach of the applicable standards of care must be excluded. It is undisputed that Dr.

Gilbert is a doctor of osteopathic medicine, who practices at the Premier Urgent and Family Care Clinic in Trussville, Alabama. He has never been trained, nor has he ever worked, as an LPN or an RN, nor does it appear that he has ever worked in the correctional setting. (Doc. 147-1 at 2). Therefore, he is not "similarly situated" to Garrick or Long and is not qualified under § 6-5-548 to testify to the applicable nursing standard of care in this case. See Thornton, 2020 U.S. Dist. LEXIS 78755, *22, 2020 WL 2128583 at *8-9 ("As medical doctors, [the proffered experts] cannot testify to the standard of care applicable to a medical assistant in an interventional cardiology practice, and cannot 'testify down' in this case.")(citing Husby v. S. Ala. Nursing Home, Inc., 712 So. 2d 750, 753 (Ala. 1998)(an anesthesiologist medical doctor could not testify as to the breach of the standard of care applicable to a nurse trained in the daily "hands on" care of nursing home patients); Colville v. DiValentin, 2009 U.S. Dist. LEXIS 149589, *25, 2009 WL 10687828, *9 (N.D. Ala. Aug. 14, 2009)(a physician is not qualified or competent to testify to a breach of the relevant standard of care applicable to a medical assistant); Coward v. Volvo Grp. N. Am., Inc., 2009 U.S. Dist. LEXIS 28712, 2009 WL 940381, *5 (M.D. Ala. Apr. 6, 2009)(holding that a board-certified orthopedic hand surgeon was not similarly situated to an emergency medical technician (EMT) and, thus, could not testify to the standard of care applicable to an EMT); Bradley, 315 F. Supp. 2d

at 1195-97 (concluding that a medical doctor and a nurse practitioner were not similarly situated to a nurse who provided hands-on nursing home care and could not offer testimony as to the nurse's applicable standard of care).

Moreover, the record does not reveal anything in Dr. Gilbert's background that would render him so "highly qualified" in hands-on correctional LPN and RN nursing that he would be exempt from the mandatory requirements of § 6-5-548. Rather, at the time of the incident in question, in January 2017, Dr. Gilbert was a family care doctor of osteopathic medicine. He was not a professor or teacher of nursing;[19] he held no outstanding qualifications; and he was no more qualified than any other family care doctor of osteopathic medicine in the United States. (Doc. 147-1 at 2). Accordingly, because Dr. Gilbert is not a similarly situated health care provider with respect to either Garrick (an LPN) or Long (an RN), Defendants' motions to exclude his testimony on the applicable standard of nursing care in this case (Doc. 113, 125) are **granted**.

Turning now to the issue of causation, Wilson has proffered the testimony of Dr. Gilbert that "the sub-standard medical care Harris received on January 21, 2017 [from Nurses Garrick and Long], caused or likely contributed to his death." (Doc. 147-1 at 15).

---

[19] Dr. Gilbert's CV shows that he was an assistant professor of family medicine at UAB from December 1997 to July 2001. (Doc. 147-1 at 2).

Defendants argue that Dr. Gilbert's testimony on causation should be excluded under a proper analysis of Rule 702 of the Federal Rules of Evidence and the holding of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), because he relies on speculation to support his opinions in this case and, therefore, cannot offer any testimony that would be helpful to the jury. (Doc. 113 at 2).

The law is clear that the proponent of expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence. See Rink v. Cheminova, Inc., 400 F.3d 1286, 1291 (11th Cir. 2005); McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1238 (11th Cir. 2005)("[t]he burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion"). Importantly, "[a]ny step that renders the analysis unreliable . . . renders the expert's testimony inadmissible." Goebel v. Denver & Rio Grande W. R.R. Co., 346 F.3d 987, 992 (10th Cir. 2003).

The admission of expert evidence is governed by FED. R. EVID. 702, as explained by Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and its progeny. See Rink, 400 F.3d at 1291. In Daubert, the Supreme Court held that the trial judge must determine at the outset "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." Daubert, 509 U.S. at

592.   _Daubert_ requires the trial court to serve as an evidentiary "gatekeeper" in making a preliminary assessment of whether the "reasoning or methodology properly can be applied to the facts in issue."   _Id._ at 593.   Rule 702 "compels the district courts to perform the critical 'gatekeeping' function concerning the admissibility of expert scientific [and technical] evidence." _United States v. Abreu_, 406 F.3d 1304, 1306 (11th Cir. 2005)(quoting _United States v. Frazier_, 387 F.3d 1244, 1260 (11th Cir. 2004)).   "This [gatekeeping] function inherently requires the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702."   _Id._   The analysis requires "the proponent of the testimony . . . [to] show that: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact. . . ."   _Maiz v. Virani_, 253 F.3d 641, 665 (11th Cir. 2001). Stated differently, "the Rules of Evidence – especially Rule 702 . . . assign to the trial judge the task of ensuring that an expert's testimony . . . rests on a reliable foundation."   _Daubert_, 509 U.S. at 597.   _Daubert_ supplies a list of four non-exclusive factors that courts may consider in evaluating the reliability of an expert's testimony, namely, testability, error rate, peer review and publication, and general acceptance.   _See id._, 509 U.S.

38

at 593-95.  Moreover, the Advisory Committee Notes to Rule 702 add the factor of whether the expert has adequately accounted for obvious alternative explanations.  See Fed. R. Evid. 702, Advisory Committee Notes (2000 Amendment).

In the present case, Defendants argue that Dr. Gilbert's opinion that Harris' death was caused by the "sub-standard medical care" that he received from Nurses Garrick and Long at 4:15 a.m. on January 21, 2017, when he was taken to the healthcare unit, is too speculative to be reliable because the foundation for the opinion is the "assumed" fact that Harris took methamphetamine *before* he was brought to the healthcare unit and was examined by Nurses Garrick and Long.  Defendants argue that it is equally possible that Harris consumed methamphetamine only *after* he left the healthcare unit and returned to his cell, making it impossible for the actions or inactions of Garrick and Long to have proximately caused his death.

Defendants are correct that the evidence in this case does not establish "when" Harris ingested the dose of methamphetamine that ended his life.[20]  However, the Court disagrees that Dr.

---

[20] Dr. Gilbert acknowledged that he did not know when Harris ingested the methamphetamine that ended his life or how much methamphetamine he ingested.  (Doc. 113-1 at 14, 16-18).  Dr. Gilbert also acknowledged that it is possible that Harris took the drug *before* he arrived at the healthcare unit, and it is possible that he consumed the drug *after* he left the healthcare unit. (Id.).  For purposes of his opinion, however, it is clear that Dr. Gilbert assumed that Harris ingested methamphetamine *before* he

39

Gilbert's assumption of facts related to the timing of the dose renders his opinion unreliable and inadmissible.  In cases such as this, where the challenge raised over the expert's methodology "involves an attack on the 'factual underpinnings' of his ultimate conclusions," such arguments go "to the weight and credibility of the expert's testimony, not to its admissibility."  <u>Ward v. Carnival Corp.</u>, 2019 U.S. Dist. LEXIS 41022, *21, 2019 WL 1228063, *7 (S.D. Fla. Mar. 14, 2019)(citing <u>Sorrels v. NCL (Bahamas), Ltd.</u>, 796 F.3d 1275, 1285 (11th Cir. 2015)("Cross-examination and the presentation of contrary evidence 'are the traditional and appropriate means of attacking shaky but admissible evidence.'"). Indeed, "there is nothing inherently flawed about an expert relying on facts he or she assumes, as the Supreme Court has observed that 'an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true.'"  <u>Ward</u>, 2019 WL 1228063 at *7 (citing <u>William v. Illinois</u>, 567 U.S. 50, 57 (2012); Fed. R. Evid. 703; <u>Mcgarity v. FM Carriers, Inc.</u>, 2012 WL 1028593, at *7 (S.D. Ga. Mar. 26, 2012)("[T]he identification of flawed data or facts relied upon by an expert is precisely the role of cross-examination and does not render expert testimony inadmissible under Daubert."); <u>Hightower v. Goldberg</u>, 2018 WL 296955, *2 (M.D. Ga. Jan. 4, 2018)("Defendants' objections go to

---

arrived at the healthcare unit and was examined by Nurses Garrick and Long.

the weight and credibility of Mr. Beauchamp's opinions, not their
reliability. If Mr. Beauchamp failed to consider certain facts in
forming his opinions, Defendants will be able to vigorously cross
examine him, present their own expert testimony, and tell the jury
why they believe his opinion should not be believed.").

Based on the foregoing, the Court finds that Defendants'
objections to Dr. Gilbert's testimony go to the weight and
credibility of the testimony, not its admissibility. Accordingly,
Dr. Gilbert's testimony against Nurses Garrick and Long on the
issue of causation is admissible, and Defendants' motions to strike
that testimony (Docs. 113, 125) are **denied.** In light of Nurse
Practitioner Roscoe's testimony regarding the standard of care,
and Dr. Gilbert's testimony regarding causation, Garrick and
Long's motion for summary judgment (Doc. 121) on Wilson's AMLA
claims for medical malpractice and wrongful death is hereby **denied.**

Wilson also asserts claims in this case against Corizon and
Dr. Patrick Arnold, M.D. (the Corizon Medical Director at Holman)
for medical malpractice and negligent hiring, training, and
supervision of Nurses Garrick and Long. Additionally, Wilson
asserts a claim against Dr. Arnold for wrongful death and against
Corizon for agency. (Doc. 17, ¶¶ 17, 103-12, 119-132, 140-47;
Doc. 120-1 at 3). As previously discussed, Wilson's claims against
Corizon and Dr. Arnold for breach of the standard of care are
governed by the AMLA. See Ala. Code § 6-5-548(a)(Under the AMLA,

41

"in any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care, the plaintiff shall have the burden of proving by substantial evidence that the health care provider failed to exercise such reasonable care, skill, and diligence as other similarly situated health care providers in the same general line of practice ordinarily have and exercise in a like case."). Thus, Wilson "must present expert testimony from a similar[ly]-situated healthcare provider to illustrate (1) the appropriate standard of care, (2) a deviation in the instant case from that standard of care, and (3) that the deviation proximately caused the injury in the case." Thornton, 2020 U.S. Dist. LEXIS 78755 at *22, 2020 WL 2128583 at *8.

In her expert report, Nurse Practitioner Roscoe offered standard of care evidence against Corizon, opining that Corizon's failure to ensure that its staff were providing appropriate care for their correctional patients deviated from the applicable standard of care in this case. (Doc. 114-2 at 11). Assuming, arguendo, that Ms. Roscoe is qualified to offer standard of care evidence against Corizon, Wilson nevertheless has failed to offer any expert evidence from Ms. Roscoe, Dr. Gilbert, or any other expert that this alleged deviation from the applicable standard of care proximately caused Harris' death. Without expert evidence on causation, Wilson's AMLA claims against Corizon fail as a matter

42

of law.    Accordingly,  Corizon's  motion  for  summary  judgment  on

Wilson's  AMLA  claims  for  negligent  hiring,  training,  and

supervision and for medical malpractice is **granted.**

As noted, Wilson also alleges that Corizon is vicariously

liable as the employer of Dr. Arnold, and Nurses Long and Garrick.

The parties agree that there can be no supervisory or vicarious

liability  on  the  part  of  Corizon  if  there  was  no  underlying

violation.    (Doc.  140  at  9-10).    See Stevenson v. Precision

Standard, Inc., 762 So. 2d 820, 824 (Ala. 1999)(liability for

negligent  or  wanton  supervision  and  training  of  employees  is

predicated on the underlying tortious conduct of an employee);

Kelley v. Jacksonville Sheriff's Office, 2021 U.S. Dist. LEXIS

68335, *9, 2021 WL 1312733, *4 (M.D. Fla. Apr. 8, 2021)("Absent

allegations of a supervisor's personal participation, or otherwise

demonstrating a causal connection between a supervisor's actions

and the alleged constitutional deprivation, supervisory officials

are not liable under § 1983 for the unconstitutional acts of their

subordinates[;][moreover,]  [t]here  can  be  no  policy-based

liability or supervisory liability when there is no underlying

constitutional violation")(quoting Knight through Kerr v. Miami-

Dade Cnty., 856 F.3d 795, 821 (11th Cir. 2017) and City of Los

Angeles v. Heller, 475 U.S. 796, 799 (1986) (internal quotation

marks omitted)).   Here, the Court has denied summary judgment on

Wilson's  AMLA  claims  against  Defendants  Garrick  and  Long.

43

Therefore, Wilson's agency claim against Corizon remains viable insofar as it is based on those claims. However, Wilson's agency claim against Corizon, that is premised on her § 1983 claims against Defendants Garrick and Long and her claim against Dr. Arnold, fail as the Court has determined that those defendants are entitled to summary judgment on those claims.[21]   Accordingly, Corizon's motion for summary judgment on Wilson's agency claim is **denied** to the extent that it is based on wrongful death and the alleged breach of the standard of care by Defendants Garrick and Long under the AMLA. Corizon's motion is **granted** in all other respects.

Next, with respect to Defendant Dr. Arnold, Plaintiff offers the testimony of Dr. Gilbert, who offered no opinions against Dr. Arnold in his expert report but testified in his deposition, that Dr. Arnold breached the applicable standard of care of physicians in the correctional setting by failing to review Harris' medical records the day after Harris became ill and by failing to follow up on any irregularities.   (Doc. 147-1 at 8-9).   However, Dr. Gilbert's proffered expert standard of care testimony against Dr. Arnold is inadmissible because Plaintiff has failed to establish

---

[21] Having granted summary judgment for Defendants Garrick and Long on Wilson's § 1983 claims, Corizon can have no vicarious liability related to those claims.   Likewise, as discussed, *infra*, having found herein that Dr. Arnold is entitled to summary judgment on all claims, there can be no vicarious liability on the part of Corizon based on any alleged acts or omissions by Dr. Arnold.

that Dr. Gilbert (an urgent care physician) is similarly situated to Dr. Arnold (a physician in the correctional setting).  Moreover, assuming that Dr. Gilbert is similarly situated to Dr. Arnold and that his standard of care testimony is admissible, Plaintiff has failed to offer any expert testimony that Dr. Arnold's alleged breach of the standard of care (*i.e.*, his failure to review Harris' medical records the day after Harris became ill) proximately caused Harris' death.  Indeed, the evidence is undisputed that Dr. Arnold was not at work at any time during Harris' illness; Dr. Arnold had no personal involvement in any of the circumstances surrounding Harris' illness or death; and Dr. Arnold was not notified of Harris' illness until after Harris' death.  (Id.; Doc. 120-1 at 3-5, 8).  Thus, having failed to establish that this alleged breach of the standard of care by Dr. Arnold proximately caused Harris' death, Plaintiff's AMLA claims against Dr. Arnold fail as a matter of law, and Dr. Arnold's motion for summary judgment on Plaintiff's AMLA claims is **granted**.

## V.   **ADOC Defendants**.

In her amended complaint, Wilson asserts claims against Correctional Defendants Mason and Johnson under § 1983 for failure to provide adequate medical care and under state law for wrongful death.[22]  (Doc. 17, ¶¶ 60-66, 80-86).  Defendants maintain that

_____

[22] As previously discussed, Wilson has abandoned her claims against correctional Defendants Bolar, Craft, Dailey, McQuirter, Raybon,

45

they are entitled to qualified immunity on Wilson's § 1983 claim and state-agent immunity on her state law claim.  (Doc. 130 at 12-15; Doc. 129 at 13-16).

### A. Defendants Johnson and Mason.

#### 1. § 1983 Failure to Provide Adequate Medical Care Resulting in Wrongful Death.

As discussed, "[i]n order for a plaintiff to establish a claim under 42 U.S.C. § 1983, he [or she] must prove (1) a violation of a constitutional right, and (2) that the alleged violation was committed by a person acting under the color of state law." Martinez v. Burns, 459 Fed. Appx. 849, 850-851 (11th Cir. 2012). As employees of the Alabama Department of Corrections, the named Correctional Defendants are state actors for purposes of this action.  See Greffey v. State of Ala. Dep't of Corrs., 996 F. Supp. 1368, 1378 (N.D. Ala. 1998)(ADOC prison officials "unquestionably were acting under color of state law when performing their assigned duties at the St. Clair Correctional Facility pursuant to authority vested in them by Alabama statutes.").  Thus, to establish her asserted claims, Wilson must establish that each named Correctional Defendant, here Officers Mason and Johnson, personally acted to deprive Harris of a constitutional right.

---

and Stewart, and the Court has granted their motions for summary judgment with respect to Wilson's claims in their entirety.

Defendants Mason and Johnson maintain that they are entitled to qualified immunity on Wilson's § 1983 claim for failure to provide adequate medical care resulting in wrongful death. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Daugherty v. Hurst, 491 F. Supp. 3d 1214, 1223 (S.D. Ala. 2020)(quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)(internal quotation marks omitted)). "To be protected by qualified immunity, the government official must first demonstrate that he was acting within the scope of his discretionary authority." Id. (citing Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1281 (11th Cir. 1998)). Here, the parties do not dispute that Defendants Mason and Johnson were acting within the scope of their discretionary duties as correctional officers with respect to the matters alleged in the complaint.

"Next, courts utilize a two-part framework to evaluate qualified immunity claims." Id. (citing Castle v. Appalachian Tech. College, 631 F.3d 1194, 1197 (11th Cir. 2011)). "The first element is whether the plaintiff's allegations, if true, establish a constitutional violation." Id. (citing Pearson, 555 U.S. at 232). "The second element is whether the constitutional right at issue was clearly established at the time of the defendant's alleged misconduct." Id. (citing Pearson, 555 U.S. at

232)(internal quotation marks omitted).  "Both elements of this test must be present for an official to lose qualified immunity, and this two-pronged analysis may be done in whatever order is deemed most appropriate for the case." Id. (citing Brown v. City of Huntsville, 608 F.3d 724, 734 (11th Cir. 2010)).  "If a plaintiff fails to establish either one, then the Defendant is entitled to qualified immunity." Id.

Turning to the second inquiry first, there is no question that "[f]ederal and state governments have a constitutional obligation to provide minimally adequate medical care to those whom they are punishing by incarceration." Sparks v. Ingle, 724 Fed. Appx. 692, 693 (11th Cir. 2018)(quoting Harris v. Thigpen, 941 F.2d 1495, 1504 (11th Cir. 1991)(internal quotation marks omitted); see also McElligott v. Foley, 182 F.3d 1248, 1254 (11th Cir. 1999)("It is well settled that the deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment," and "an official acts with deliberate indifference when he or she knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate.")(quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)(internal quotation marks omitted); see also Brown v. Hughes, 894 F.2d 1533, 1538 (11th Cir. 1990)(a prison guard acts with deliberate indifference when he or she "ignore[s] without

48

explanation a prisoner's serious medical condition that is known or obvious to them."). Thus, Wilson has established that, in light of the specific context of this case, Harris' constitutional rights were clearly established.

The Court must now determine whether Wilson has established that Mason and Johnson were personally deliberately indifferent to Harris' serious medical need. "[D]eliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." McElligott, 182 F.3d at 1255. "[S]ummary judgment must be granted for the defendant official unless the plaintiff presents evidence of the official's subjective knowledge, as follows: since a finding of deliberate indifference requires a finding of the defendant's subjective awareness of the relevant risk, a genuine issue of material fact exists only if the record contains evidence, albeit circumstantial, of such subjective awareness." Id. (quoting Campbell v. Sikes, 169 F.3d 1353, 1364 (11th Cir. 1999)(internal quotation marks omitted). "Likewise, in addition to the subjective awareness of the relevant risk, Estelle requires that plaintiff show more than mere negligence to establish a violation of the Eighth Amendment and defeat a prison official's motion for summary judgment." Id.

In their motions for summary judgment, Mason and Johnson assert that they are entitled to summary judgment on Wilson's

deliberate indifference claim because there is no evidence that either was deliberately indifferent to Harris' serious medical need. (Doc. 129 at 8; Doc. 130 at 5). In opposition to Johnson's and Mason's summary judgment motions, Wilson has presented a declaration executed by inmate Quandarius Faulkner and other inmates in which the declarants state that, on January 21, 2017, at approximately 6:30 p.m., they observed officers, who were supposed to be conducting cells checks, sitting in the "office" (cube) in the segregation unit "where they can hear inmate[s] very clearl[y]." (Doc. 149-1 at 26). According to the declarants, beginning at approximately 6:30 p.m., inmates in segregation yelled for help *for hours*, shouting "man down-man down" in an effort to get the officers to come out of the cube and check on Harris (referred to as "Bear"), but the officers "never made one move."[23] (Id.). The inmates further state that, when the officers finally came onto the floor hours later and went to "Bear's" cell, he was dead. (Id.). In one section of the declaration, the officers are identified as "Tate and Bennett," while in another section of the declaration, they are identified as "Johnson and Mason." (Id. at 26-27). This evidence places Johnson and Mason

---

[23] The evidence is undisputed that there are no cameras or intercoms on death row or the segregation unit; thus, in order to get the officers' attention, the inmates have to yell and beat on the cells. (Doc. 152-1 at 7).

in Cube 5 in the segregation unit at the time that the inmates were shouting for help for Harris.

In addition, Wilson relies on a second written statement signed by inmate Quandarius Faulkner, who alleges that, on January 21, 2017, Johnson and Mason were in the segregation unit after 6:00 p.m., when inmates shouted right at them trying to get their attention for Harris, who was crying out in pain, but the officers ignored the inmates' calls for help. (Doc. 149-1 at 28). Additionally, Wilson offers the declaration of inmate Mario Flores, who alleges that on January 21, 2017, his cell was located five cells down from Harris' cell and that he heard the inmates "hollering and kicking on cells" saying "man down, man down" and that the officers would not come. (Doc. 149-1 at 57). He further alleges that he heard Harris hollering for help over and over and that officers finally came around 2:00 a.m. and found Harris dead.[24] (Id.).

Also, Officer McQuirter testified that, on the evening of January 21, 2017, he worked as the cube operator in Cube 5 in the segregation unit from 6:00 p.m. to 10:00 p.m.[25] (Doc. 128-15 at 3-

---

[24] As noted, *supra*, Defendants Mason and Johnson deny that they were indifferent to Harris' medical needs or that they heard anyone call for help for Harris. (Doc. 128-9 at 2; Doc. 152-1 at 5; Doc. 129 at 9).

[25] As a cube officer, McQuirter was not allowed to leave the cube during his shift. (Doc. 128-8 at 2; Doc. 128-15 at 3).

5).  McQuirter testified that the segregation unit was very noisy during his shift, that inmates often beat on their cells and yell,[26] and that at no time did he hear anyone call for help.[27]  (Doc. 128-15 at 3-5; Doc. 128-8 at 2; Doc. 128-3 at 7-8; Doc. 152-1 at 5).  However, the inmate declarants testified that the officers sitting inside the cube/office in the segregation unit (referring to Johnson and Mason) "can hear inmates very clearly."  (Doc. 149-1 at 26;).  This conflict cannot be resolved on summary judgment.

The evidence further shows that Cubes 3 and 4 at Holman Correctional Facility are located in death row, and Cube 5 is located in the segregation unit. (Doc. 133-1 at 1).  The cubes are adjacent to one another, and each cube has a cube operator, who is responsible for opening and closing the gate to control entry into the cube and for recording the activities of all of the officers. (Doc. 128-3 at 2-3; Doc. 128-15 at 3).  By having all three cube operators simultaneously logging the officers' activities in each of the cubes (Cubes 3, 4, and 5), the prison is able to maintain a record of routine activities performed by the officers in each of those cubes.  (Doc. 138-1 at 24; Doc. 128-3 at 3; Doc. 133-1 at 1).

---

[26] Officer Craft testified that inmates often beat on their cells and yell to get each other's attention.  (Doc. 128-3 at 7-8).

[27] Other officers testified that it was difficult to hear inside the cube because of all of the noise.  (Doc. 128-15 at 3-5; Doc. 128-8 at 2; Doc. 128-3 at 7-8; Doc. 152-1 at 5).

Defendants Johnson and Mason acknowledge, and the duty records reflect, that they were on duty at Holman on January 21 and 22, 2017. (Doc. 128-8 at 2; Doc. 138-1 at 24-25, 64; Doc. 152-1 at 30-35). As noted, *supra,* the relevant evidence shows that, on January 21, 2017, at approximately 4:15 a.m., Mason, along with Johnson and Craft, took Harris to the HCU to seek medical help after Mason noticed that Harris appeared to be acting out of character, with slurred speech and smelling of bleach. The medical staff assessed Harris with a bleach allergy and recommended that he remain in the HCU. Harris refused; so, Mason ventilated Harris' cell in an effort eliminate the bleach odor. (Doc. 130 at 9-10).

Later that evening, Johnson was assigned as the rover on the segregation unit beginning at 6:30 p.m. (Doc. 128-3 at 5; Doc. 129 at 2). As the segregation rover, Johnson was responsible for conducting cell checks and counts and other duties such as meals, pill call, and showers. (Doc. 128-15; Doc. 128-8 at 2; Doc. 128-9; Doc. 128-3). Although the duty log for Cube 5 in the segregation unit is missing (Doc. 128-15 at 4), the duty logs from the other cubes record that Johnson performed various tasks on the segregation unit during the evening of January 21, 2017, *at 6:30 p.m.,* 10:00 p.m., 11:00 p.m., and from 1:30 a.m. to 2:18 a.m. on the morning of January 22, 2017. (Doc. 133-1 at 2-5). In addition, the duty post log entries from the other cubes show that the unit rovers (which would include Johnson) conducted tier/cell checks on

their respective units on January 21, 2017, at 7:30 p.m., 8:05 p.m., 8:31 p.m., 9:35 p.m., 10:00 p.m., 11:35 p.m., and on January 22, 2017, at 12:05 a.m., 12:30 a.m., and 2:35 a.m. (Doc. 133-1 at 2-5).  This evidence places Johnson on the segregation unit floor performing his duties as rover at the precise time that the inmates claim they were yelling at him for help for Harris.

Meanwhile, the evidence shows that Mason was assigned to the adjacent death row unit as a rover during the same period. (Doc. 128-8 at 2; Doc. 128-9 at 1).  As a death row rover, Mason was responsible for conducting cell checks and performing other duties in his assigned area, *i.e.*, death row.  (Doc. 128-3 at 2).  Mason testified that he worked the death row unit from 6:00 p.m. to 10:00 p.m. on January 21, 2017.  However, the duty logs reflect that, from approximately 9:00 p.m. to 9:15 p.m., Mason escorted Nurse Thomas to the floor of the segregation unit for pill call. (Doc. 133-1 at 4).  Indeed, Mason acknowledged in his statement to the I&I investigator that he escorted Nurse Thomas to pill call on the segregation unit at approximately 9:15 p.m. on the evening of January 21, 2017.  (Doc. 139).  This evidence places Mason on the segregation unit floor at the time that the inmates were yelling for help for Harris "for hours" and also places Mason at Harris' cell at 9:15 p.m. when Harris ostensibly refused to take his medication at pill call.  (Doc. 138-1 at 23).

54

In addition, Officer McQuirter testified that, although the duty log was missing for Cube 5 (on the segregation unit) for his shift from 6:00 p.m. to 10:00 p.m. on January 21, 2017, the log did not, in any event, list any officer activities for the segregation unit that evening[28] because *no officers came to the segregation unit at any time during his shift*.[29] (Doc. 128-15 at 4-5). This conflict in the evidence cannot be resolved on summary judgment.

Based on the foregoing evidence, a genuine issue of material fact exists with respect to whether Mason and/or Johnson were present in the segregation unit on the evening of January 21, 2017; if so, whether they were alerted (while in the cube or on the floor

---

[28] Per McQuirter, the only notation that his duty log had on it from that night was that he relieved the day shift cube operator and that he accounted for the keys and equipment. (Doc. 128-15 at 4).

[29] The Court notes that, if Wilson were merely arguing that Johnson and Mason were deliberately indifferent for failing to perform their duties to conduct cell checks or pill calls in segregation on the evening in question, such would not be sufficient to support a claim of deliberate indifference. See Goodman v. Kimbrough, 718 F. 3d 1325, 1332 (11th Cir. 2013)(defendants' failure to perform required cell checks, deactivation of emergency call button, and failure to actually enter the cells when performing head counts amounted to negligence and gross negligence but, absent evidence showing a subjective awareness of risk and indicating that officers deliberately disregarded a risk that the victim was in danger, the plaintiff's claim for deliberate indifference failed.). Here, however, Wilson contends that Johnson and Mason were in the segregation unit on the evening of January 21, 2017; that they were alerted to the fact that Harris was experiencing a medical emergency; and that they disregarded the inmates' pleas for help.

performing duties such as checks, counts, and pill call) that Harris was suffering from a serious medical condition;[30] and whether they deliberately ignored that need for help.[31]  It is not the province of the Court at this stage to determine the accuracy of the log entries or to resolve inconsistencies between the evidence.  Rather, it is the Court's obligation to view the evidence in the light most favorable to Wilson.[32]  Having done so, the evidence, if true, supports Wilson's claim that Johnson and Mason were present in the segregation unit (in the cube and on the floor) when Harris needed medical help; they were alerted to

---

[30] Also relevant to this inquiry is the evidence that Johnson and Mason had escorted Harris to the HCU less than twenty-four hours earlier for a serious medical condition, and the segregation unit had no cameras or intercoms, making it necessary (and common) for inmates to yell or bang on the cells to get the officers' attention when an inmate needed medical help. (Doc. 128-15 at 5; Doc. 152-1 at 5, 7).

[31] Defendants point out that their expert, Jack Kalin, Ph.D., who is a board-certified toxicologist, opined that Harris' *ingestion* of the methamphetamine, which caused his death, would likely have occurred six to twelve hours before his death, but in no event less than two hours before his death.  (Doc. 129 at 9; Doc. 128-11 at 2).  Given this evidence, as well as the evidence that Harris was found dead at 2:40 a.m. on January 22, 2017 (Doc. 117-3 at 7) and that Johnson and Mason were in the segregation unit and were alerted to Harris' need for medical help while performing their duties between 6:30 p.m. on January 21, 2017 and 2:40 a.m. on January 22, 2017, a reasonable jury could find that their failure to procure Harris medical attention proximately caused Harris' death.  Therefore, the Court rejects any purported argument by Defendants based on lack of evidence of causation.

[32] To be clear, the Court's holding today does not mean that Wilson's version of the facts will ultimately prove to be correct.

Harris' need for medical help; and they ignored Harris' serious
medical need. Therefore, at this stage of the litigation, Johnson
and Mason are not entitled to qualified immunity on Wilson's §
1983 deliberate indifference claim, and their motions for summary
judgment on Wilson's § 1983 claims are **denied.**

**B. Wrongful Death Claim Pursuant to Ala. Code, § 6-5-410.**

Next, Wilson asserts a wrongful death claim against
Defendants Johnson and Mason, in their individual capacities,
pursuant to Ala. Code, § 6-5-410. (Doc. 17 ¶¶ 11, 80-86). Wilson
alleges that, with knowledge that Harris was in acute medical
distress, Johnson and Mason negligently, wantonly, and
purposefully failed to obtain medical treatment, resulting in
Harris' wrongful death, and that Johnson and Mason's acts or
omissions were willful, malicious, in bad faith, beyond his
authority, or under a mistaken interpretation of the law. (Id.).
Johnson and Mason maintain that they are is entitled to summary
judgment because Wilson has presented no evidence to support her
allegations against them and because they are entitled to state-
agent immunity on Wilson's state law claim. (Doc. 130 at 12).

First, as Defendants point out, to sustain her claim for
wrongful death against them, Wilson must offer proof of a wrongful
act, omission, or negligence by each Defendant. See Ala. Code, §
6-5-410 ("A personal representative may commence an action and
recover such damages as the jury may assess . . . for the wrongful

act, omission, or negligence of any person . . . whereby the death of the testator or intestate was caused. . . .").

Moreover, "employees of the DOC are entitled to State-agent immunity when in conducting the activities made the basis of the action they were exercising judgment in the administration of the DOC." Ex parte Ruffin, 160 So. 3d 750, 753 (Ala. 2014)(citations and internal quotation marks omitted). "The restatement of State-agent immunity as set out in Ex parte Cranman, 792 So. 2d 392 (Ala. 2000), governs the determination of whether a State agent is entitled to immunity." Id. In Cranman, 792 So. 2d at 405, the Alabama Supreme Court stated the test for State-agent immunity, in pertinent part, as follows:

> A State agent *shall* be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's . . .
>
>> (3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
>>
>> (4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; . . .
>
> Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent *shall not* be immune from civil liability in his or her personal capacity . . .

(2) when the State agent acts willfully,
maliciously, fraudulently, in bad faith,
beyond his or her authority, or under a
mistaken interpretation of the law.

(Emphasis in original).

"[T]he test for state agent immunity follows a similar burden-shifting framework as qualified immunity." Daugherty, 491 F. Supp. 3d at 1227 (citing Hunter v. Leeds, 941 F.3d 1265, 1283 (11th Cir. 2019)). "First, the officer must show that the claims arise from a law enforcement function." Id. (citing Ex parte City of Montgomery, 272 So. 3d 155, 161 (Ala. 2018)). "Then the burden shifts to the plaintiff to show one of the Cranman exceptions applies." Id.

As with the prior analysis under federal law, there is no dispute that Johnson and Mason were acting in a discretionary function when managing the confinement and guarding of prisoners. See Ex parte Ruffin, 160 So. 3d at 754. Thus, they have met their initial burden of showing that they are entitled to state-agent immunity. See Ruffin, 160 So. 3d at 753. Accordingly, the burden now shifts to Wilson to show that an exception applies. See Daugherty, 491 F. Supp. 3d at 1227.

The exception being argued here is that the State agents acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority. "The immunity afforded State agents who exercise their judgment . . . is not abrogated for negligent and wanton

59

behavior; instead, immunity is withheld only upon a showing that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority." Giambrone v. Douglas, 874 So. 2d 1046, 1057 (Ala. 2003).

For the same factual reasons that Johnson and Mason are not entitled to qualified immunity on Wilson's federal claim, the Court finds that they similarly are not entitled to state-agent immunity on her state law wrongful death claim. As discussed, there is conflicting evidence in this case about whether Johnson and Mason heard inmates' pleas for medical help for Harris on January 21, 2017, and willfully ignored said pleas. As discussed, it is not the province of the Court at this stage to determine the accuracy of this evidence or to resolve inconsistencies between the evidence. It is the Court's obligation to view this evidence in the light most favorable to Wilson, and having done so, the evidence suggests that Johnson and Mason were in Cube 5 and on the floor in the segregation unit at the time that the inmates were yelling for help for Harris, beginning at approximately 6:30 p.m. and continuing for hours; that Johnson and Mason were able to hear the pleas for help and therefore knew that Harris needed medical help; and that they failed to obtain medical treatment for Harris. This evidence, if true, would support Wilson's claim that Johnson and Mason acted willfully, maliciously, or beyond his authority in denying Harris medical care which led to his death. Therefore, at

this stage of the litigation, Johnson and Mason are not entitled to state-agent immunity on Wilson's state law wrongful death claim.

In sum, because Wilson has proffered evidence that Johnson and Mason acted willfully, maliciously, fraudulently or in bad faith, beyond their authority, or under a mistaken interpretation of the law in failing to obtain medical treatment for Harris, they are not entitled to state-agent immunity on Wilson's state law wrongful death claim. Accordingly, Johnson's and Mason's motion for summary judgment (Doc. 127) on Plaintiff's state law wrongful death claim is **denied.**

### IV. Conclusion.[33]

Based on the foregoing, Defendants Dr. Arnold, Bolar, Craft, Dailey, McQuirter, Raybon, and Stewart's motions for summary judgment (Docs. 118, 127) are **GRANTED** on all claims; Defendants Garrick and Long's motion for summary judgment (Doc. 121) is **GRANTED in part** as to Plaintiff's federal § 1983 claims and **DENIED in part** as to Plaintiff's state law AMLA claims; Defendant Corizon's motion for summary judgment (Doc. 115) is **GRANTED in part** as to Plaintiff's AMLA claims and as to Plaintiff's agency

---

[33] The Court has considered Wilson's motion to amend the Court's order of March 24, 2020, denying leave to disclose expert witness Dr. Adel Shaker. (Doc. 168). For the reasons stated in the Court's previous order (Doc. 88), and Defendants' response (Doc. 169), the motion (Doc. 168) is **denied.** Defendants' motion to strike (Doc. 169) Plaintiff's motion to amend the Court's order is **denied** as moot.

claim related to Dr. Arnold and **DENIED in part** as to Plaintiff's agency claims related to Garrick and Long; and Defendants Johnson and Mason's motion for summary judgment (Doc. 127) is **DENIED** as to all claims.  Accordingly, Plaintiff's claims against Defendants Dr. Arnold, Bolar, Craft, Dailey, McQuirter, Raybon, and Stewart are **DISMISSED with prejudice** in their entirety.

For the reasons stated herein, Defendants' motions to exclude the testimony of Plaintiff's expert Lori Roscoe (Docs. 114, 126) are **DENIED**; Defendants' motions to exclude the testimony of Plaintiff's expert Dr. Robert Gilbert (Docs. 113, 125) are **GRANTED in part** as to Dr. Gilbert's opinion on the applicable standard of care and **DENIED in part** as to Dr. Gilbert's opinion on causation; Plaintiff's motion to amend the Court's order (Doc. 168) is **DENIED**; and Defendants' motion to strike Plaintiff's motion to amend the Court's order (Doc. 169) is **DENIED** as moot.

**DONE** this **4th** day of **August, 2021.**

> /s/ SONJA F. BIVINS
> **UNITED STATES MAGISTRATE JUDGE**